UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BUFFALO TEACHERS FEDERATION, BUFFALO
EDUCATIONAL SUPPORT TEAM-NEA/NY,
TRANSPORTATION AIDES OF BUFFALO, NEA/NY,
SUBSTITUTES UNITED/BUFFALO-NEA/NY,
BUFFALO COUNCIL OF SUPERVISORS AND
ADMINISTRATORS, AFSCME LOCAL 264,
PROFESSIONAL, CLERICAL AND TECHNICAL
EMPLOYEES' ASSOCIATION and LOCAL 409
INTERNATIONAL UNION OF OPERATING
ENGINEERS,

                                    Plaintiffs,

        v.                                                          **DECISION AND ORDER**
                                                                    04-CV-457S

RICHARD TOBE, THOMAS E. BAKER, ALAIR
TOWNSEND, H. CARL McCALL, JOHN J. FASO,
JOEL A. GIAMBRA, MAYOR ANTHONY MASIELLO,
RICHARD A. STENHOUSE and ROBERT G.
WILMERS, *in their official capacities as directors/
members of the Buffalo Fiscal Stability Authority*,

                                    Defendants.

## I. INTRODUCTION

        On July 3, 2003, the legislature of the State of New York created the Buffalo Fiscal

Stability Authority ("the Control Board") to stabilize and improve the city of Buffalo's failing

financial health.[1]  One of the powers the legislature vested in the Control Board is the

discretion to freeze wages.  On April 21, 2004, the Control Board exercised that discretion

and enacted a Wage Freeze Resolution, which for purposes of this case, had the effect

---

[1]The Buffalo Fiscal Stability Authority Act created the Buffalo Fiscal Stability Authority.  To avoid
confusion, this Court will refer to the Buffalo Fiscal Stability Authority Act as the "BFSA" and the Buffalo
Fiscal Stability Authority as "the Control Board" throughout this decision.

of eliminating contractual salary increases that Plaintiffs had negotiated with the city of Buffalo school district.

Plaintiffs filed suit in this court challenging the Buffalo Fiscal Stability Authority Act (the "BFSA") and the Wage Freeze Resolution as violative of the Contract and Takings Clauses of the United States Constitution.  Presently before me are the parties' competing Motions for Summary Judgment.[2]  Having reviewed the motion papers and the applicable law, I find that the Wage Freeze Resolution is not unconstitutional.  Rather, the state has acted properly within its police power to address the city of Buffalo's dire financial situation.  The Wage Freeze Resolution is a reasonable and necessary means to remedy the city's economic inviability and secure the welfare of its residents.  It serves the ultimate goal of restoring the city's fiscal independence.  Accordingly, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## II. BACKGROUND

### A.    The Parties and the Collective Bargaining Agreements

Plaintiffs are employee organizations that serve as the exclusive bargaining representatives for their respective employee units.[3]  (Plaintiffs' Rule 56 Statement of

---

[2]In support of their Motion for Summary Judgment, Plaintiffs filed the following documents: a memorandum of law, a Rule 56 Statement of Undisputed Facts, with appendix, and a reply memorandum of law.  In opposition, Defendants filed a memorandum of law with exhibits.
     In support of their Motion for Summary Judgment, Defendants filed the following: a memorandum of law, a Rule 56 Statement of Undisputed Facts, the Declaration of Dorothy A. Johnson, with attached exhibits, and a reply memorandum of law.  In opposition, Plaintiffs filed a memorandum of law and a response to Defendants' Rule 56 Statement of Undisputed Facts.

[3]Plaintiffs represent individuals employed by the city of Buffalo school district in the following capacities:  teachers; certain teachers' aides and health care aides; bus aides; substitute teachers; principals, assistant principals, directors, supervisors, project administrators and assistant superintendents; service center employees, cook managers and cafeteria employees; professional, clerical and technical personnel; and engineering personnel.  (Defendants' Statement, ¶¶ 1-8.)

Undisputed Facts ("Plaintiffs' Statement"), ¶ 1; Defendants' Rule 56 Statement of Undisputed Facts ("Defendants' Statement"), ¶¶ 1-8.) Defendants are directors/members of the Control Board, which is a public benefit corporation.   (Defendants' Statement, ¶¶ 9, 10.)

Each Plaintiff employee organization is a party to a collective bargaining agreement with the city of Buffalo school district.  (Plaintiffs' Statement, ¶ 2; Defendants' Statement, ¶¶ 1-8; 11, 13, 15, 17, 19, 21, 23, 25.)   These agreements provide for periodic step increases and/or other types of salary increases, such as longevity payments, to be paid to the covered employees.[4]  (Plaintiffs' Statement, ¶¶ 3-4; Defendants' Statement, ¶¶ 27, 29.)  On average, the covered employees are contractually entitled to receive salary increases of roughly 2% per year.  (Plaintiffs' Statement, ¶ 5.)

## B.    The City of Buffalo's Fiscal Crisis

In May of 2003, the Speaker of the New York State Assembly requested that the State Comptroller's Office conduct a review of the city of Buffalo's finances.  (Defendants' Statement, ¶ 58; Johnson Declaration, Exhibit D.)  This review was intended to assist lawmakers in determining whether the city would need financial assistance from the state to close current and future budget gaps.  (Defendants' Statement, ¶ 59; Johnson Decl., Exhibit C, p. 1.)

The State Comptroller's ensuing report detailed the city of Buffalo's desperate fiscal

---

[4]This Court notes that the agreements between Plaintiffs and the school district have all expired and that successor agreements have not been entered.  (Defendants' Statement, ¶¶ 13-26.)  However, under New York's Civil Service Law, the terms of the expired agreements remain in force until new agreements are reached.  See N.Y. CIV. SERV. LAW § 209-a(1)(e) (McKinney 1999); Ass'n of Surrogates & Supreme Court Reporters v. State of New York, 588 N.E.2d 51, 53 (N.Y. 1992).

straits.  (Johnson Decl., Exhibit C.)   Among others, the State Comptroller made the

following findings:

- • The city of Buffalo had been operating with a structural deficit for several years, and was only able to fund its operations with increasing state aid and the use of its reserves.  (Johnson Decl., Exhibit C, p. 1.)

- • The city of Buffalo's budget increases since 1997-1998 were funded through increasing state aid, which grew from $67 million in 1997-1998 to $123 million in the city's 2002-2003 fiscal year.  (Johnson Decl., Exhibit C, p. 12.)

- • The city had a combined deficit for the fiscal years 2000-2001 and 2001-2002 of $23.8 million, and the 2002-2003 budget as initially adopted was balanced only by exhausting the city's reserves.  (Johnson Decl., Exhibit C, pp. 1, 12.)

- • The city of Buffalo's estimated budget deficit for 2002-2003 was $7.5 million. The city also faced a 2004-2005 estimated budget deficit ranging from $30-$48 million up to $60-$78 million, depending on the Board of Education's budget.  The city faced increased estimated deficits of $76-$107 and $93-$127 million in 2005-2006 and 2006-2007, respectively.  (Johnson Decl., Exhibit C, pp. 1-2, 12, 20-22.)

The State Comptroller concluded  that due to these continuing and serious

structural imbalances, the city of Buffalo was not in a position to rectify its budget on its

own.  (Defendants' Statement, ¶ 62; Johnson Decl., Exhibit C, pp. 2, 30.)   He also

concluded that a new approach must be adopted by the city to restore its fiscal integrity.

(Johnson Decl., Exhibit C, p. 30.)  In the State Comptroller's view, it was incumbent upon

the city to adopt financial plans and practices that would bring its recurring expenses in

line with its recurring revenue.  (Johnson Decl., Exhibit C, p. 30.) To that end, one of the

State Comptroller's recommendations was that the state legislature create a control board

to oversee and administer Buffalo's finances "to ensure that effective long-term

restructuring takes place in Buffalo."  (Defendants' Statement, ¶ 60; Johnson Decl., Exhibit

4

C, p. 2.)  The State Comptroller also recommended that the control board be given the power to freeze wages in the event of a declared fiscal crisis.  (Johnson Decl., Exhibit C, p. 31.)  The state legislature accepted both recommendations.

## C.    Enactment of the BFSA

On July 3, 2003, the New York State legislature enacted the BFSA.  <u>See</u> N.Y. Pub. Auth. Law § 3850, et seq. (McKinney Supp. 2005).   As indicated in the legislative declaration of need, the impetus of the BFSA was the city of Buffalo's crumbling finances, as evidenced in the State Comptroller's report:

> The legislature hereby finds and declares that the city of Buffalo is facing a severe fiscal crisis, and that the crisis cannot be resolved absent assistance from the state.  The legislature finds that the city has repeatedly relied on annual extraordinary increases in state aid to balance its budget, and that the state cannot continue to take such extraordinary actions on the city's behalf.  The legislature further finds and declares the maintenance of a balanced budget by the city of Buffalo is a matter of overriding state concern, requiring the legislature to intervene to provide a means whereby: the long-term fiscal stability of the city will be assured, the confidence of investors in the city's bonds and notes is preserved, and the economy of both the region and the state as a whole is protected.

N.Y. Pub. Auth. Law § 3850-a.

In general, the BFSA requires the Control Board to monitor the city of Buffalo's financial plans on an ongoing basis to ensure that the city is adhering to the detailed fiscal requirements set forth in the BFSA.  (Defendants' Statement, ¶ 56.)  For example, the BFSA requires that the city prepare and submit to the Control Board a four-year (2004-2007) financial plan demonstrating, among other things, that annual operating expenses

will not exceed annual operating revenues.  N.Y. PUB. AUTH. LAW § 3857(1).  The goal is

for the city to steadily balance its budget gaps with less and less outside financial

assistance until it can independently balance its budget in 2008-2009.  N.Y. PUB. AUTH.

LAW § 3857(1).

The city's financial plans must be approved by the Control Board.  N.Y. PUB. AUTH.

LAW §§ 3858(2)(a).   The BFSA provides a mechanism by which the Control Board may

review and modify the city's financial plans.  N.Y. PUB. AUTH. LAW § 3857.  If the city fails

to modify its financial plans or fails to demonstrate that it is closing its budget gaps

according to the requirements of the BFSA, the Control Board is vested with the authority

to act to ensure that the city takes all necessary corrective actions.  N.Y. PUB. AUTH. LAW

§§ 3857(2), 3858(2).  For example, the BFSA specifically authorizes the Control Board to

impose a "wage and/or hiring freeze" upon a finding that such a freeze is "essential to the

adoption or maintenance of a city budget or a financial plan that is in compliance with [the

BFSA]."  N.Y. PUB. AUTH. LAW § 3858(2)(c)(i).  The BFSA specifically provides that

> the [Control Board] shall be empowered to order that all
> increases in salary or wages of employees of the city and the
> employees of covered organizations which will take effect after
> the date of the order pursuant to collective bargaining
> agreements, other analogous contracts, or interest arbitration
> awards, now in existence or hereafter entered into, requiring
> such salary or wage increases as of any date thereafter are
> suspended.

N.Y. PUB. AUTH. LAW § 3858(2)(c)(i).

The BFSA further provides that the frozen wages shall not be paid retroactively:

> no retroactive pay adjustments of any kind shall accrue or be
> deemed to accrue during the period of wage freeze, and no

> such additional amounts shall be paid at the time a wage
> freeze is lifted, or at any time thereafter.

N.Y. PUB. AUTH. LAW § 3858(2)(c)(iii).

### D.    Implementation of the Wage Freeze

On October 21, 2003, the Control Board approved a four-year financial plan for the city. (Johnson Decl., Exh. A.)  The Control Board continued to review and monitor the economic conditions of the city and the viability of the four-year plan as it is required to do under the BFSA. (Johnson Decl., Exh. A.)  In doing so, the Control Board discovered that the immediate financial plan was out of balance, and that the city was projecting multiple increases in recurring expenditures, primarily related to personnel costs. (Johnson Decl., Exh. A.)  Specifically, the Control Board determined that the city was projecting an increase in the 2004-2005 budget gap of more than $20 million above the $26 million gap projected in the financial plan, and that the projected cumulative gap over the next financial plan would exceed $250 million.  (Johnson Decl., Exh. A.)

Consequently, on April 21, 2004, the Control Board enacted Resolution No. 04-35, otherwise known as the Wage Freeze Resolution. (Defendants' Statement, ¶ 37; Johnson Decl., Exh. A.)  This resolution was enacted based on the Control Board's finding that a wage freeze was "essential to the maintenance of the Revised Financial Plan and to the adoption and maintenance of future financial plans and budgets that are now in compliance with the [BFSA]." (Johnson Decl., Exh. A.)  In pertinent part, the Control Board

resolved as follows:

> RESOLVED AND ORDERED, that a wage freeze, with respect to the City and all Covered Organizations, is essential to the maintenance of the Revised Financial Plan and to the adoption and maintenance of future budgets and financial plans that are in compliance with the Act; and be it further

> RESOLVED AND ORDERED, that effective immediately, there shall be a freeze with respect to all wages, wage rates, and salary amounts for all employees of the City and all Non-exempt Covered Organizations, to the full extent authorized by the Act (the "Wage Freeze"), and be it further

> RESOLVED AND ORDERED, that this Wage Freeze shall apply to prevent and prohibit any increase in wage rates, wages or salaries for any employee of the City or a Non-exempt Covered Organization, including, but not limited to, any increased payments for holiday and vacation differentials, shift differentials, salary adjustments according to plan and step-ups or increments; and including increases in wage rates, wages or salaries pursuant to any plan or schedule for advancement or promotion; and including any increases in wage rates, wages or salaries provided for under collective bargaining agreements, interest arbitration awards, employment agreements, or discretionary increases to non-represented employees, provided that such suspended salary or wage increase shall not be considered as part of compensation or final compensation or annual salary earned or earnable for the purpose of computing the pension base of any retirement allowances; and be it further

> ORDERED AND RESOLVED, that the foregoing Wage Freeze shall apply to prevent and prohibit any increase in wage rates, wages or salaries that is scheduled to commence or otherwise take effect on or after the effective date of the Wage Freeze, notwithstanding that (a) the increase was bargained for, provided for in an existing collective bargaining agreement, or otherwise planned prior to the effective date of the Wage Freeze, and/or; (b) the increase is designated as retroactive, or otherwise purports to relate to work performed prior to the

effective date of the Wage Freeze.

The wage freeze took effect immediately, on April 21, 2004.  (Johnson Decl., Exh. A.)

### E.      Procedural History

On June 17, 2004, Plaintiffs commenced this action by filing a Complaint in the United States District Court for the Western District of New York.  Defendants filed their Answer on July 27, 2004.  On February 28, 2005, the parties filed Cross-Motions for Summary Judgment.  After full briefing on the motions, this Court held oral argument on May 24, 2005, and reserved decision at that time.

### III. DISCUSSION

### A.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## B.   Nature of Plaintiffs' Challenge

Plaintiffs' Complaint contains two causes of action under 42 U.S.C. § 1983.  First, Plaintiffs assert that the State of New York, acting by and through the Defendants, has impaired their contractual rights by imposing the wage freeze in violation of the Contract Clause of the United States Constitution.  See U.S. Const. art. I, § 10, cl. 1.  Second, Plaintiffs contend that the state, acting by and through Defendants, has taken their private property without just compensation in violation of the Takings Clause of the Constitution. See U.S. Const. amend. V.

Generally, a legislative Act may be challenged in two ways: (1) by establishing that it is wholly or facially, unconstitutional or (2) by demonstrating that it is unconstitutional as applied in a particular way or as applied to a particular person or group.  Here, Plaintiffs are limited to "as applied" challenges.  This is because the BFSA itself does not diminish or eliminate Plaintiffs' contractual rights, nor does it alter or affect in any way Plaintiffs'

collective bargaining agreements with the city of Buffalo school district.[5]  Thus, the BFSA, standing on its own, does not substantially impair Plaintiffs' contractual rights.  See Cranley v. Nat'l Life Ins. Co. of Vt., 144 F.Supp.2d 291, 302 (D.Vt. 2001) (rejecting a facial challenge to a state statute under the Contract Clause where the statute itself did not affect the plaintiffs' contractual rights).  Similarly, the enactment of the BFSA, in and of itself, has not deprived Plaintiffs of any property.  It is only the Control Board's exercise of its remedial authority that arguably implicates the taking of a property interest.  As such, any facial challenge to the BFSA under the Takings Clause would also fail.

Counsel argued at length about the true nature of Plaintiffs' challenge in this case.  (See, e.g.,Tr. at 7-33[6]).  Plaintiffs maintain that they are challenging both the BFSA and the Wage Freeze Resolution.  They challenge the BFSA in the sense that it is the source of the Control Board's authority to freeze wages, but they ultimately challenge the Wage Freeze Resolution because it is the act that caused them injury.

Defendants interpret Plaintiffs' Complaint as challenging only the Control Board's decision to impose the wage freeze, to the exclusion of a constitutional challenge to the Control Board's authority to do so.  Defendants' conclusion in this regard is supported by the text of the Complaint.  For example, the very first paragraph of the Complaint characterizes this action as a "challenge [to] a recently-adopted resolution by the Buffalo Fiscal Stability Authority ("BFSA") – Resolution No. 04-35."  (Complaint, ¶ 1.)  In the

---

[5]At oral argument, Plaintiffs' counsel conceded that "the [BFSA] did nothing to our clients.  The statute was not self-executing . . . ."  (Tr. at 21.)

[6]Referring to the transcript of the oral argument before this Court on May 24, 2005.

second paragraph, Plaintiffs identify the Wage Freeze Resolution, not the BFSA, as impairing their rights under the Contract and Takings Clauses. (Complaint, ¶ 2.)  In fact, Plaintiffs' prayers for relief seek (1) a declaration that the *Wage Freeze Resolution* violates the Contract and Takings Clauses, (2) a declaration that the *Wage Freeze Resolution* is unconstitutional and all actions taken pursuant to it are void *ab initio*, and (3) an Order enjoining Defendants from further implementing the *Wage Freeze Resolution*. (Complaint, p. 12 (emphasis added).)  As such, Defendants argue that this Court should not reach the constitutional issues presented by Plaintiffs.[7]

As Plaintiffs' counsel conceded at oral argument, the Complaint could indeed have been more artfully drafted to make clear the nature of Plaintiffs' constitutional claims and theories.  (Tr. at 10, 11.)  However, this Court will not exalt form over substance in this important case, and finds that Plaintiffs' Complaint meets the minimum requirements of notice pleading under Rule 8(a) of the Federal Rules of Civil Procedure.  See FED. R. CIV. P. 8(a) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief").  Given the history and nature of this litigation, it would be a veiled fiction to conclude that Defendants were unaware that Plaintiffs intended to challenge the

---

[7]Defendants also argue that this Court should not entertain Plaintiff's challenge to the BFSA because the Attorney General of the State of New York was not properly notified that this action involves a constitutional challenge to a state statute.  Without commenting on whether notification was initially proper, this Court notes that the State Attorney General failed to intervene or otherwise involve himself in this case even after the Honorable Leslie G. Foschio, the United States Magistrate Judge assigned to this case, filed a Certification of Action Challenging the Constitutionality of a New York State Statute pursuant to 28 U.S.C. § 2403(b).  By this Certification, notice was given that "Plaintiffs request for declaratory relief may also draw into question New York State's legislation creating and authorizing the [Control Board] to adopt the Wage Freeze Resolution."  (Certification of Action, Docket No. 20, p. 1-2.)  Accordingly, due to his inaction after the issuance of this Certification, this Court concludes that the State Attorney General would have declined to appear even if he had been notified of the nature of this action sooner.  As such, Defendants have suffered no prejudice on this basis.

constitutionality of the state's action.   Moreover, the parties have presented complete written and oral arguments on the constitutional issues.   As such, this Court detects no prejudice to Defendants by entertaining Plaintiffs' constitutional challenge and will therefore proceed accordingly.

### C.    Contract Clause

The Contract Clause bars states from passing any "Law impairing the Obligation of Contracts." U.S. CONST. art. I, § 10, cl. 1.  However, this prohibition is not absolute.  See, e.g., United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977) ("Although the Contract Clause appears literally to proscribe any impairment, this court [has] observed that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." (quotation omitted)); Sanitation & Recycling Indus. v. City of New York, 107 F.3d 985, 992-93 (2d Cir. 1997) (Contract Clause limits the power of the state to abridge contractual relationships, but is not an absolute bar).

The Supreme Court has interpreted the Contract Clause as preserving "the inherent police power of the State 'to safeguard the vital interests of its people.'" Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434, 54 S.Ct. 231, 78 L.Ed. 413 (1934)); see also United States Trust, 431 U.S. at 21; Sanitation & Recycling Indus., 107 F.3d at 993 ("Contract Clause must be accommodated to the police power a state exercises to protects its citizens").  The police power is described as "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and

general welfare of the people, [which] is paramount to any rights under contracts between individuals." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978).

It is well settled that not all state impairments of contracts violate the Contract Clause; rather "the Clause is not violated unless the impairment is a substantial one." Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 52 (2d Cir. 1998) (citing Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109-10, 117 L.Ed.2d 328 (1992)).  This circuit employs a three-part test to determine whether a piece of legislation violates the Contract Clause:

> (1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate.

Tinnerello, 141 F.3d at 52-53 (quoting Sanitation & Recycling Indus., 107 F.3d at 993); see also Cranley, 144 F.Supp.2d at 302.

## 1. Substantial Impairment

The first step is to determine whether the state law at issue has resulted in an impairment that is substantial.  "The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." Sanitation & Recycling Indus., 107 F.2d at 993 (citing Energy Reserves, 459 U.S. at 411).

Here, Plaintiffs argue that the elimination of their contractual rights to annual salary

increases of roughly 2% per year for an indeterminate amount of time constitutes a substantial impairment.  Defendants do not persuasively challenge this assertion.[8]  Indeed, lesser impairments in a similar context have been found by the circuit court to be substantial impairments.  See, e.g., Condell v. Bress, 983 F.2d 415, 417-19 (2d Cir. 1993) (indefinite postponement of five days' pay under a lag payroll system found to be substantial impairment); Ass'n of Surrogates & Supreme Court Reporters v. State of New York, 940 F.2d 766, 772 (2d Cir. 1991) (indefinite postponement of ten days' pay under a lag payroll system found to be substantial impairment).  This is because

> [t]he affected employees have surely relied on full paychecks to pay for such essentials as food and housing.  Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like – obligations which might go unpaid in the months that the lag payroll has its immediate impact.

Surrogates, 940 F.2d at 772.

The Wage Freeze Resolution in the instant case impacts affected employees in the same manner.  Plaintiffs' contracts call for 2% annual salary increases.  Certainly a vast majority of Plaintiffs reasonably relied on receiving salary increases when making financial decisions, particularly whether to enter long-term financial commitments.  Accordingly, this Court finds that the permanent cancellation of Plaintiffs' 2% annual salary increases is an impairment of contract that is substantial.  This, of course, does not end the inquiry.  The more difficult question is whether this substantial impairment is constitutionally permissible.

---

[8]This Court is not persuaded by Defendant's argument that a substantial impairment has not occurred because the wage freeze in this case is prospective.  Such was also the case in Condell v. Bress, 983 F.2d 415, 417-19 (2d Cir. 1993) and Ass'n of Surrogates & Supreme Court Reporters v. State of New York, 940 F.2d 766, 772 (2d Cir. 1991).

See Surrogates, 940 F.2d at 771 ("finding an impairment of contract is merely a threshold step toward resolving the more difficult question whether that impairment is permitted under the Constitution" (internal quotation and citation omitted)).

## 2.    Significant Social or Economic Purpose

The next inquiry tests the validity of the legislative purpose.  To pass constitutional muster, the law at issue must have a "legitimate public purpose" and should be aimed at remedying an important "general social or economic problem."  Energy Reserves, 459 U.S. at 411.

The parties offer somewhat different viewpoints on the purpose of the BFSA and by extension, the Wage Freeze Resolution.  Plaintiffs contend that while the BFSA may have been primarily aimed at solving the city of Buffalo's fiscal crisis, it was also enacted to decrease or eliminate the amount of extraordinary financial aid the state had been providing to the city of Buffalo.[9]  Defendants counter that the state enacted the BFSA not out of a desire to lessen its contributions to the city, but rather, to provide the city a framework within which it could work to regain its financial independence.

This Court is not persuaded by Plaintiffs' suggestion that part of the state's motivation in enacting the BFSA was to save itself money.  In Plaintiffs' view, the state made a conscious decision to provide for a wage freeze so that it would not have to remit

---

[9]At oral argument, however, Plaintiffs' counsel appeared to concede that the BFSA was enacted to address the city of Buffalo's fiscal crisis.  (See Tr. at 56 ("the [BFSA] as a whole is certainly devoted mostly to the interest of the citizens of Buffalo."); Tr. at 88 (conceding that the impetus of the BFSA was the financial crisis in the city of Buffalo).)

further aid to the city to cover the cost of the contractual salary increases.  Plaintiffs seize on the legislature's finding that "the city has repeatedly relied on annual extraordinary increases in state aid to balance its budget, and that the state cannot continue to take such extraordinary actions on the city's behalf," N.Y. PUB. AUTH. LAW § 3850-a, as dispositive evidence that the state's motivation in enacting the BFSA was, at least in part, financial.  This legislative finding, however, cannot be considered in isolation.  It comes in the context of the state's concern that one of its major municipalities is unable to balance its own budget.  Read as such, this statement is not indicative of an underlying motivation to save money.  Plaintiffs' narrow interpretation is simply not supported by the text of the BFSA, nor the legislative findings in support thereof.

A fair reading of the BFSA demonstrates that the state's motivation for enacting the BFSA was to rectify the city's inability to manage its own finances.  For example, the state provided a detailed framework with very specific parameters and deadlines for the city of Buffalo to follow in order to get back on its feet and regain fiscal independence; it did not simply cease sending financial assistance to the city, which it could have done at any time.  To the contrary, the BFSA contemplates and provides for *continuing* state aid to the city. See, e.g., N.Y. PUB. AUTH. LAW §§ 3857, 3861.

Moreover, the legislative declaration of need for state intervention indicates that the city of Buffalo is facing "a severe fiscal crisis, and that the crisis cannot be resolved absent assistance from the state."  N.Y. PUB. AUTH. LAW § 3850-a.  The reference to "assistance" can surely be read as suggesting financial assistance, as Plaintiffs would advocate, but reading the BFSA in its totality, it is more reasonable that the term "assistance" be read

broadly.  The BFSA on its face, for example, provides assistance in the form of a detailed financial recovery plan and an oversight commission – the Control Board.  In fact, the legislature specifically found that

> maintenance of a balanced budget by the city of Buffalo is a matter of overriding state concern, requiring the legislature to intervene to provide a means whereby: the long-term fiscal stability of the city will be assured, the confidence of investors in the city's bonds and notes is preserved, and the economy of both the region and the state as a whole is protected.

N.Y. PUB. AUTH. LAW § 3850-a.  As such, the purpose of the BFSA was to provide assistance to the city of Buffalo in the form of long-term solutions to the rampant budgetary problems that threatened the city's fiscal viability and endangered the welfare of its residents.  This Court is convinced that the reason for the state's intervention was to assist the city in ameliorating and solving its financial crisis, not to simply reduce future state expenditures.

The historical and statutory notes underlying the enactment of the BFSA, the pertinent portion of which is set out in the margin, also supports this Court's conclusion.[10]

---

[10]The historical and statutory notes provide, in relevant part, as follows:

> Legislative findings.  The legislature hereby finds and declares that a condition of fiscal difficulty has existed for several years in the city of Buffalo, as a result of a weakened economy, population declines, and job losses.  In recent months, the city's fiscal condition has been further weakened by the impact of the national economic recession, which has had a greater negative impact in Buffalo than in many other areas of the state.  These factors have led to a structural imbalance between revenues and expenditures which, when combined with the city's limited ability to increase taxes on its residents, has resulted in a downgrade of Buffalo's bonds by independent bond rating services.

> It is hereby found and declared that the city is in a state of fiscal crisis, and that the welfare of the inhabitants of the city is seriously threatened.  The city budget must be balanced and economic recovery enhanced.  Actions should be undertaken which preserve essential services to city residents,

It is clear that the thrust of the state's concern was with rebuilding the city of Buffalo's economic foundation.  See 2003 N.Y. LAWS Ch. 122, S. 5695 (McKinney's).   The legislature recognized the city's weakened economy and the fact that the city was in a state of fiscal crisis.  See id.  It therefore determined that the correct remedy would be a combination of enhanced budgetary discipline and short-term budgetary relief as set out in the BFSA, thus the imposition of the financial plan requirement and outside oversight.  See N.Y. PUB. AUTH. LAW §§ 3856, 3857.  The Wage Freeze Resolution itself is a direct response to the city's continued inability to properly manage its financial affairs and follow the approved four-year plan.  (Johnson Decl., Exh. A.)

In sum, this Court finds that the BFSA and Wage Freeze Resolution have a legitimate public purpose, that being the stabilization of the city of Buffalo's budgetary problems and the resurrection of its fiscal independence.  The purpose is not to save the state money.  This Court further finds that the BFSA and Wage Freeze Resolution are aimed at remedying an important social problem, that being the economic inviability of the city and the threatened welfare of the city's residents.  Id.  The state is therefore acting within the proper scope of its police power.  See Energy Reserves, 459 U.S. at 412 ("The

---

while also ensuring that taxes remain affordable.  Actions contrary to these two essential goals jeopardize the city's long-term fiscal health and impede economic growth for the city, the region, and the state.

It is, therefore, further found and declared that a combination of enhanced budgetary discipline and short-term budgetary discipline and short-term budgetary relief is necessary to assist the city in returning to fiscal and economic stability, while ensuring adequate funding for the provision of essential services and for the maintenance, expansion, and rebuilding of the infrastructure of the city.

2003 N.Y. LAWS Ch. 122, S. 5695 (McKinney's).

requirement of a legitimate public purpose guarantees that the State is exercising its police power . . . .").

### 3.    Reasonable and Necessary Means

Having found the existence of a substantial impairment and a legitimate legislative purpose, the state's action can withstand scrutiny "only if it is 'reasonable and necessary'" to serve the purposes of the BFSA.  Surrogates, 940 F.2d at 772 (quoting United States Trust Co., 431 U.S. at 25); see also Sanitation & Recycling Indus., 107 F.3d at 302.  The law must be "specifically tailored to meet the societal ill it is supposedly designed to ameliorate."  Sanitation & Recycling Indus., 107 F.3d at 302  (citing Spannaus, 438 U.S. at 243).  Determining whether the means are reasonable and necessary is a difficult task, which must be "resolved by balancing the contractual rights of the individual against 'the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'" Surrogates, 940 F.2d at 771 (quoting Home Building & Loan, 290 U.S. at 435 (internal quotation and citation omitted)).  An important component of conducting this inquiry is identifying the scope of deference due the state's action.

In the ordinary course involving private contracts, courts "defer to legislative judgment as to the necessity and reasonableness of a particular measure." United States Trust, 431 U.S. at 23.  However, in cases where the state is self-interested and seeks to avoid or impair its own contractual obligations, deference to legislative judgment as to reasonableness and necessity is not appropriate:

> The Contract Clause is not an absolute bar to subsequent
> modification of a State's own financial obligations.  As with
> laws impairing the obligations of private contracts, an

> impairment may be constitutional if it is reasonable and
> necessary to serve an important public purpose. In applying
> this standard, however, complete deference to a legislative
> assessment of reasonableness and necessity is not
> appropriate because the State's self-interest is at stake. A
> governmental entity can always find a use for extra money,
> especially when taxes do not have to be raised. If a State
> could reduce its financial obligations whenever it wanted to
> spend the money for what it regarded as an important public
> purpose, the Contract Clause would provide no protection at
> all.

Id. at 26; see also County of Suffolk v. Long Island Lighting Co., 14 F.Supp.2d 260, 268

(E.D.N.Y. 1998) ("where the state seeks to evade its financial contractual obligations, the

Supreme Court has indicated that the courts must apply something higher than the rational

basis standard") (citing United States Trust, 431 U.S. at 26).

Plaintiffs argue that this Court should not defer to the state legislature in this case

because the state's self-interest is at stake. They rest their argument on the Second

Circuit's decisions in Surrogates and Condell. In Surrogates, the court faced a challenge

to a lag payroll system enacted by the New York state legislature to fund the creation of

new judgeships and court positions in the state's Unified Court System. At that time, New

York was facing a fiscal crisis. To save money and to help finance the new positions, the

legislature enacted a law imposing a lag payroll system for nonjudicial employees of the

Unified Court System. The effect of the lag payroll was to delay payment of the affected

employees' salaries until two weeks after the salaries were earned. Prior to this system,

employees were paid their bi-weekly salaries immediately after the two weeks were

worked. The ten days' pay that was withheld under the system was eventually payable to

the employees at the termination of their employment with the state at the rate of pay

21

applicable to them on the date of their separation.

The affected employees challenged the lag payroll system under the Contract Clause. In considering the plaintiffs' challenge, the court eschewed the deference typically afforded legislative judgment because it found that the lag payroll system was self-serving. See Surrogates, 940 F.2d at 771.  In particular, the court found that the legislation was self-serving because it "impairs obligations of *its own* contracts."  Surrogates, 940 F.2d at 771 (emphasis in original).  Applying heightened scrutiny, the court found that the lag payroll system was not necessary to achieve the state's goal of expanding the court system.  See id. at 773.

> It cannot be said that a lag payroll for only judicial employees was essential in order to finance the expansion of the court system.  The state could have shifted the seven million dollars from another government program, or it could have raised taxes.  We recognize that neither alternative would have been popular among politician-legislators, but that is precisely the reasons that the contract clause exists – as a 'constitutional check on state legislation.'

Id. (quoting Spannaus, 438 U.S. at 241).

In essence, the court found that the existence of available alternatives to impairing the state's own contracts, albeit not as appealing, rendered the lag payroll system unconstitutional.  See Surrogates, 940 F.2d at 774 ("The contract clause, if it is to mean anything, must prohibit New York from dishonoring its existing contractual obligations when other policy alternatives are available.").  The Court reiterated the Supreme Court's admonition that "a State is not completely free to consider impairing the obligations of its own contracts on par with other policy alternatives."  United States Trust, 431 U.S. at 30-

31; see Surrogates, 940 F.2d at 773.

Approximately a year and a half later, the Second Circuit decided Condell.  In Condell, the court was again faced with a lag payroll measure enacted by the State of New York, this one imposing a one week lag payroll on executive branch employees.  The five days' of withheld salary was payable to the employees at the termination of their employment with the state, as it was in Surrogates.

The impetus of this system was a budget deficit estimated to be $1.005 billion in November 1990.  The Governor had made public his desire to eliminate the budget deficit without issuing Tax and Revenue Anticipation Notes, levying new taxes, raising rates on existing taxes or laying off additional executive branch employees.  These options were considered, but rejected as unwise fiscal policy.  The expected bounty from the lagged wages was $128 million. Following Surrogates, the court again found that the state was self-interested and struck down the legislation as unconstitutional under the Contract Clause because alternatives to the lag payroll measure were available.  See Condell, 983 F.2d at 420.

Defendants argue that this case is distinguishable from Surrogates and Condell, and this Court agrees.  Unlike the case at bar, Surrogates and Condell undisputedly involve self-serving legislation.  Self-serving legislation, as the cases describe it, consists of two principal components: a direct financial benefit to the state, and the abrogation of the state's own contracts.  See United States Trust, 431 U.S. at 25-26 ; Surrogates, 940 F.2d at 771-73, Condell, 983 F.2d at 418; see also McDermott v. Cuomo, No. 91-CV-57,

1992 WL 133900 (N.D.N.Y. June 11, 2002).  In Surrogates, the state's purpose in enacting the lag payroll system was to gain a direct financial benefit of upwards of $7 million to devote to court expansion; in Condell, the state's purpose was to raise an estimated $128 million to apply to deficit reduction.  In both cases, the state blatantly and directly impaired its own contractual obligations to raise revenue.

The BFSA and Wage Freeze Resolution, however, involve neither a direct financial benefit to the state, nor a direct abrogation of the state's own contracts.  Because of this, the BFSA and Wage Freeze Resolution are not self-serving like the legislation considered in Surrogates and Condell.  As previously discussed herein at length, the state legislature did not enact this legislation as a money saving measure.  Its purpose, rather, was to stabilize the city of Buffalo's budgetary problems and resurrect its fiscal independence.

It is undisputed that *no* direct revenue to the state is generated by the wage freeze. Plaintiffs' nonetheless contend that the state gains a benefit by not having to provide the city with additional financial assistance to cover the cost of Plaintiffs' wage increases.  This argument is purely theoretical.  At first blush, it is obvious that the city of Buffalo is the entity that immediately benefits by not having to pay the cost of the salary increases.  After all, it is the city, not the state, that is party to the underlying contracts and responsible for making payment.  More important, there is no evidence supporting Plaintiffs argument that there is a direct correlation between the cost of Plaintiffs' salary increases and the amount of additional assistance the state would have to provide to the city.  That is, if the cost of Plaintiffs' salary increases is "x," there is no evidence that the city would require corresponding state aid in the amount of "x" to cover those salary increases.

A myriad number of factors play into the city's need for financial assistance from the state. Plaintiffs have presented no evidence that the city would require additional state aid for the specific purpose of paying Plaintiffs' salary increases. As such, Plaintiffs have not demonstrated that the implementation of their salary increases would necessarily increase the city's need from the state.

Plaintiffs' theory contains an additional flaw. Plaintiffs concede that the state has no legal duty to provide financial assistance to the city. (Tr. at 36.) Indeed, there is complete agreement that the state's past aid to the city of Buffalo has not come as the result of any legal compulsion. While Plaintiffs argue that the state may have a moral or political motivation to assist the city, the fact remains that there is no legal requirement that it do so. In the absence of such a requirement, it cannot be said that the state gains anything from the wage freeze. For if there is no duty to provide funds in the first place, the state receives nothing from a possible reduction in the amount of its benevolent giving. At the end of the day, the state does not receive a direct financial benefit as a result of the wage freeze.

As to the second component, Surrogates and Condell involved the state directly abrogating its own contracts. It relieved itself of a financial obligation by reneging on its promise to pay its employees immediately upon the completion of their work. The state was, in essence, forcibly borrowing money directly from the affected employees to fund court expansion and debt reduction. The Second Circuit specifically emphasized that the reason that state action in both cases was impermissible was because the state had violated its own contract. See, e.g., Surrogates, 940 F.2d at 771 (lag payroll system was

self-serving because it "impairs obligations of *its own* contracts" (emphasis in original));
see also McDermott, 1992 WL 133900, at *2-*5 (lag payroll system struck down where
state was impairing its own contracts).  In stark contrast, the state here is not a party to the
contracts at issue and gains nothing from the implementation of the wage freeze.  The
contracts are between Plaintiffs and the city of Buffalo's school district.  The state is
therefore not impairing its own contract.  There is no redistribution of funds from Plaintiffs
to the state as there was in Surrogates and Condell.

Accordingly, this Court finds that this case falls outside of Surrogates and Condell
because it does not involve "self-serving" legislation.  While this finding insulates the
legislation in this case from the "searching analysis" performed in Surrogates and Condell,
it does not completely answer the question of how much deference should be paid to the
legislature's action.

As stated previously, when private contracts are at issue, courts ordinarily "defer
to legislative judgment as to the necessity and reasonableness of a particular measure."
United States Trust, 431 U.S. at 23.  And when the state impairs its own contracts for its
own financial gain, courts review the act with more searching scrutiny, but nonetheless
afford the state "some" deference.  See United States Trust, 431 U.S. at 26; Long Island
Lighting Co., 14 F.Supp.2d at 268; see also Baltimore Teachers Union, Am. Fed. of
Teachers Local 340, AFL-CIO v. Mayor & City Council of Baltimore, 6 F.3d 1012, 1019 and
n. 10 (4th Cir. 1993) (discussing United States Trust and concluding that  "some"
deference remains due to self-serving legislative policy decisions).  This case falls
somewhere in between.

In this Court's view, this case presents circumstances closer to the impairment of a private contract than to self-serving impairment of a public contract. The State is impairing a contract that it is not a party to, yet the contract is a public contract. Accordingly, this Court will not completely defer to the state legislature's determinations, but will afford the legislature more than "some" deference.

In judging whether the state's determinations in this case are reasonable and necessary, this Court is mindful that "the inherent police power of the State 'to safeguard the vital interests of its people'" must be preserved. Energy Reserves, 459 U.S. at 410 (quoting Home Bldg. & Loan, 290 U.S. at 434). As the Second Circuit has noted, the "Contract Clause must be accommodated to the police power a state exercises to protect its citizens." Sanitation & Recycling Indus., 107 F.3d at 993. The intersection of the state's police power and the protections of the Contract Clause therefore presents difficult terrain. It requires a careful balancing of the contractual rights of the individual with the state's inherent power to ensure the welfare of its citizenry. See Spannaus, 438 U.S. at 241; see also Home Building & Loan, 290 U.S. at 435; Surrogates, 940 F.2d at 771.

This Court first finds that the state's enactment of the BFSA and imposition of the wage freeze resolution is reasonable. Under the BFSA, a wage freeze can only be imposed under certain circumstances and for a limited duration. First, a wage freeze can only be imposed during a "control period." N.Y. PUB. AUTH. LAW § 3858(2). A "control period" consists of that period of time when the city is working toward compliance with the requirements of the BFSA. See N.Y. PUB. AUTH. LAW §§ 3851(10), 3858(1). The Control Board is not authorized to impose a wage freeze while serving in an advisory capacity.

<u>See</u> N.Y. Pub. Auth. Law §§ 3851(1), 3858(2).  Second, a wage freeze can only be imposed if the Control Board finds that it is "essential to the adoption or maintenance of a city budget or a financial plan [under the BFSA]."  N.Y. Pub. Auth. Law § 3858(2)(c).  Absent such a finding, no wage freeze can be imposed.  Third, any imposition of a wage freeze must be periodically reviewed by the Control Board.  N.Y. Pub. Auth. Law § 3858(2)(d).  Finally, the wage freeze will only remain in place until the Control Board determines that the fiscal crisis warranting the wage freeze has abated.  N.Y. Pub. Auth. Law § 3858(2)(d).

Further, this Court finds that the BFSA and Wage Freeze Resolution are necessary to address the city of Buffalo's financial predicament.  It is undisputed that the city of Buffalo was drowning year after year in a fiscal crisis.  Plaintiffs have not challenged any of the findings regarding the city's ongoing financial predicament.  Plaintiffs nonetheless argue that imposition of the wage freeze is not necessary because the state has other alternatives.  Again, Plaintiffs rely on <u>Surrogates</u> and <u>Condell</u>.

Again, however, these cases are distinguishable.  In <u>Surrogates</u> and <u>Condell</u>, the Second Circuit applied searching scrutiny when determining whether the state's decision to impair its own contracts was necessary.  This level of scrutiny applied, of course, because the state was acting in its own self-interest.  Under heightened scrutiny, the court looked to whether the state had exhausted all of its available alternatives, no matter how politically unpopular, before resorting to abrogating or modifying its own contracts.  Because the state had not done so, the Court found that the impairment of its own contracts was not necessary or essential to achieve its stated goals.

Such heightened level of scrutiny does not apply in this case because the state, as discussed above, is not acting in its own self-interest.  Under the circumstances presented here, where the state is validly exercising its police power, the level of searching scrutiny performed in Surrogates and Condell does not apply.  Rather, this Court affords considerable deference (less than complete deference, but greater than some deference) to the state's decision that a wage freeze is necessary to achieve the goals of the BFSA. In doing so, this Court finds that the wage freeze is both reasonable and necessary to remedy the dire financial situation facing the city of Buffalo.  At bottom, this Court finds that the state validly exercised its legitimate police power by specifically tailoring this legislation to the social ill it was designed to ameliorate.  See Sanitation & Recycling Indus., 107 F.3d at 302.  As such, no violation of the Contract Clause has occurred.[11]

### D.    Takings Clause

The Takings Clause of the Fifth Amendment provides that "nor shall private property be taken for public use, without just compensation."  U.S. CONST. amend. V.  This clause is made applicable to the states through the Fourteenth Amendment.  See Kelo v. City of New London, Connecticut, __ U.S. __, 125 S.Ct. 2655, 2658 n. 1, __ L.Ed.2d __ (2005) (citing B.R. Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)).  The Takings Clause imposes two conditions on a state's authority to take private property: "the taking must be for a public use and just compensation must be paid to the owner."  Brown

---

[11]This Court notes, as did Defendants, that the constitutionality of similar wage freezes has been upheld in other jurisdictions.  See, e.g., Baltimore Teachers Union, Am. Fed. of Teachers Local 340, AFL-CIO v. Mayor & City Council of Baltimore, 6 F.3d 1012 (4th Cir. 1993); Subway-Surface Supervisors Ass'n. v. New York City Transit Auth., 375 N.E.2d 384 (N.Y. 1978).

v. Legal Found. of Wash., 538 U.S. 216, 231, 123 S.Ct. 1406, 1417, 155 L.Ed.2d 376 (2003) (internal quotations omitted); see First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power").   The purpose of the Takings Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); see also Mejia v. City of New York, No. 01 Civ. 3381, 2004 WL 2884407, at *4 (S.D.N.Y. Dec. 10, 2004) (citing Armstrong).

Generally speaking, there are two types of takings.  The quintessential taking is one where "a direct government appropriation or physical invasion of private property" occurs. Lingle v. Chevron U.S.A., Inc., __ U.S. __, 125 S.Ct. 2074, 2081, __ L.Ed.2d __ (2005); see Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S.Ct. 2448, 2457, 150 L.Ed.2d 592 (2001) ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use."); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-323, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (describing the Supreme Court's jurisprudence involving physical takings to be "as old as the Republic").

The other type of taking is one first recognized in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), where "the Court recognized that there will be instances when government actions do not encroach upon or occupy the property

yet still affect and limit its use to such an extent that a taking occurs." Palazzolo, 533 U.S. at 617 (discussing Pennsylvania Coal).  This type of taking is commonly referred to as a "regulatory taking."  "Regulatory takings are based on the principle that 'while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking.'" Ganci v. New York City Transit Auth., No. 04 Civ. 1346, 2005 WL 850915, at *4 (S.D.N.Y. April 13, 2005) (citing Pennsylvania Coal, 260 U.S. at 415).

To establish a violation of the Takings Clause, Plaintiffs must first demonstrate that they possess a property interest that is protected by the constitution.  See Mejia, 2004 WL 2884407, at *4 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-01, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)).  Second, they must establish that the government deprived them of that interest for public purposes.  See Ganci, 2005 WL 850915, at *4.  Third, Plaintiffs must prove that the government did not provide just compensation.  See id.

Here, Plaintiffs argue that the first type of taking has occurred, that is a physical taking.  In fact, Plaintiffs expressly deny that the state's action constitutes a regulatory taking, and this Court offers no opinion on that issue.[12]  (See, e.g., Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, p. 14 ("this is not a 'regulatory takings' case . . . it is rather a 'categorical takings' case"); Tr. at 78 (indicating that no regulatory taking has occurred).

The first and third inquiries present no problem.  The Supreme Court has stated that

---

[12]For the sake of completeness, this Court notes that Defendants argue that Plaintiffs' Takings claim should be analyzed under the "regulatory takings" line of authority.  However, because Plaintiffs have made clear that they are not asserting a regulatory taking claim, that line of authority is not instructive here.

31

contract rights are a form of property for purposes of the Takings Clause.  United States Trust, 431 U.S. at 19 n. 16 ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); Lynch v. United States, 292 U.S. 571, 579, 545 S.Ct. 840, 843, 78 L.Ed. 1434 (1934) (finding that valid contracts are property within the meaning of the Takings Clause).  Accordingly, for purposes of this stage of the analysis, this Court finds that as to the first inquiry, Plaintiffs' contractual rights to salary increases warrant constitutional protection.  Moreover, as to the third inquiry, it is agreed that Plaintiffs have not received any compensation related to the wage freeze.

The second inquiry is whether the state has taken Plaintiffs' property for its own proposed use.  This is where Plaintiffs' physical taking claim fails.  Just compensation is required when the government directly acquires private property for a public purpose.  Brown, 538 U.S at 233.  Here, as discussed at length above, the state has not itself taken any private property for a public purpose.

Physical takings cases involve the government directly appropriating private property for its own use.  See, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (Government appropriation of rooftop to provide cable television access constituted a taking); United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (Government's seizure and operation of a coal mine to prevent national strike of coal miners effected a taking); United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (Government's use of private airspace to approach government airport required compensation); United States v. Gen.

Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed.311 (1945) (Government's occupation

of private warehouse effected a taking).

Plaintiffs argue that the state enacted the BFSA and imposed the wage freeze in

order to eliminate the need for it to provide the city of Buffalo with extraordinary financial

aid.   To that end, Plaintiffs argue that the state, through the Control Board, has

permanently taken their contract rights for the public purpose of reducing the amount of

state aid that must be paid to the city of Buffalo.  This Court has already rejected this line

of argument in the context of Plaintiffs' Contract Clause claim.  There simply is no evidence

in the record supporting the claim that the state made a purposeful decision to take

Plaintiffs' salary increases to offset future aid to the city.  Here, the state has not directly

appropriated property for its own use.

Finally, Plaintiffs have not provided this Court with any cases holding that a wage

freeze constitutes an unconstitutional physical taking under the Takings Clause, and this

Court's research did not reveal any.  Indeed, none of the principal cases relied upon by

the parties presented Takings claims or otherwise applied a Takings analysis to wage

modification legislation.

Accordingly, this Court finds that the state has not appropriated or physically taken

Plaintiffs' property to fulfill a public purpose.   Therefore, no violation of the Fifth

Amendment has occurred.  Lingle, 125 S.Ct. at 2081 (describing the "classic taking" as

one where "the government directly appropriates private property"); Palazzolo, 533 U.S.

at 617 ("The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use.").

## IV. CONCLUSION

For the reasons discussed above, this Court finds that the BFSA and the Wage Freeze Resolution are not unconstitutional as either violative of the Contracts Clause or the Takings Clause.  Rather, this Court finds that the state has acted properly within its police power to address a significant social and economic problem – the city of Buffalo's dire financial situation.  Accordingly, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## V. ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Summary Judgment (Docket No. 22) is DENIED.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 23) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:      August 18, 2005
            Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge
